## MRVICA v. ESPERDY, DISTRICT DIRECTOR, IMMIGRATION AND NATURALIZATION SERVICE.

No. 353. Argued March 5, 1964.—Decided March 30, 1964.

*Edith Lowenstein* argued the cause and filed a brief for petitioner.

*Richard W. Schmude* argued the cause for respondent. With him on the brief were *Solicitor General Cox, Assistant Attorney General Miller, Louis F. Claiborne* and *Beatrice Rosenberg.*

Mr. Justice Harlan delivered the opinion of the Court.

This case involves construction of the provisions of § 249 of the Immigration and Nationality Act, 66 Stat. 163, 219, 8 U. S. C. § 1259, which in certain circumstances permits an alien illegally in this country to apply for a record of lawful admission into the United States for permanent residence.

The petitioner is a native and citizen of Yugoslavia, who entered this country under a temporary landing per-

mit in January 1940,[1] as a nonimmigrant crewman attached to a merchant ship. He remained beyond the period allowed by the permit without permission until September 4, 1942, when a warrant for his deportation was issued. Soon thereafter, he signed as a member of the crew of a Yugoslav ship about to depart from the United States. The ship sailed with the petitioner on board on October 6, 1942, and, after calling at several ports in Chile, returned to the United States on December 19, 1942. The petitioner was detained on board ship for several days, but was then allowed to go ashore for medical treatment.[2] He has not left the country since.

In 1951, new deportation proceedings were instituted against the petitioner, whose presence in this country apparently had meanwhile gone unnoticed by the immigration authorities. He was again found subject to deportation but was granted the privilege of voluntary departure. This decision of the hearing officer was affirmed by the Assistant Commissioner, whose order became final on March 22, 1954, when the Board of Immigration Appeals entered an order dismissing the peti-

---

[1] The exact date of the petitioner's entry is uncertain. Both parties state in their briefs that he entered on January 21, 1940, which is the date given by the petitioner at a deportation hearing in 1952. In the warrant for the petitioner's deportation which issued in 1942, the date of entry is given as January 25, 1940, which is the date of entry established at a deportation hearing in 1942.

[2] In his brief, the petitioner states that he came ashore "by reason of the permission granted him prior to sailing," Brief p. 4, presumably a reference to the "Ninth Proviso clause" contained in the 1942 order of deportation, which is discussed hereafter. In the hearing which preceded the later deportation order of 1952, the petitioner testified that he came ashore pursuant to special permission granted him because he was ill, which was the finding of the hearing officer. Which of these grounds was the actual basis for admission is, for reasons appearing later, immaterial to the disposition of this case.

tioner's appeal. Other proceedings followed, which ultimately resulted in 1959 in an order that the petitioner be deported to Yugoslavia. The petitioner's application for the status of a permanent resident under § 249 of the Immigration and Nationality Act was denied on the ground, explained more fully below, that his departure in 1942 made him ineligible for such discretionary relief because it deprived him of the prerequisite continuous residence in the United States since 1940. In 1960 the petitioner brought this action in the United States District Court for review of the administrative ruling and a declaratory judgment that he was eligible for relief under § 249. The District Court granted summary judgment for the respondent, 202 F. Supp. 214, which the Court of Appeals affirmed, 317 F. 2d 220. We granted certiorari, 375 U. S. 894, and now affirm the rulings below.

Section 249 of the Immigration and Nationality Act provides:

> "A record of lawful admission for permanent residence may, in the discretion of the Attorney General and under such regulations as he may prescribe, be made in the case of any alien, as of the date of the approval of his application or, if entry occurred prior to July 1, 1924, as of the date of such entry, if no such record is otherwise available and such alien shall satisfy the Attorney General that he is not inadmissible under section 212 (a) insofar as it relates to criminals, procurers and other immoral persons, subversives, violators of the narcotic laws or smugglers of aliens, and he establishes that he—

> "(a) entered the United States prior to June 28, 1940;

> "(b) has had his residence in the United States continuously since such entry;

"(c) is a person of good moral character; and

"(d) is not ineligible to citizenship." 72 Stat. 546, amending 66 Stat. 219, 8 U. S. C. § 1259.[3]

It is agreed by both sides that the petitioner satisfies all the specified criteria except the requirement of continuous residence since an entry prior to June 28, 1940. The question for decision is whether his departure from the United States in 1942 and his absence from this country for several months thereafter defeat his claim to a continuous residence here since 1940.

The petitioner, whose case has been earnestly and ably pressed before us, concedes that he was ordered deported in 1942 and that his departure "executed" the order of deportation. There can be no doubt that this latter point is correct. Legislation then applicable provided that ". . . any alien ordered deported . . . who has left the United States shall be considered to have been deported in pursuance of law, irrespective of the source from which the expenses of his transportation were defrayed or of the place to which he departed." Act of March 4, 1929, § 1 (b), 45 Stat. 1551, 8 U. S. C. (1940 ed.) § 180 (b).[4]

---

[3] The 1958 amendment of § 249, *inter alia,* removed the requirement that an alien applying for relief under that section not be "subject to deportation." Compare 66 Stat. 219 with 72 Stat. 546. The petitioner argues that this change indicates a legislative judgment favorable to his situation. But the humanitarian motives which may have prompted the 1958 amendment do not reach the present case, which is concerned with the requirement of continuous residence, left untouched by the amendment.

[4] This enactment was for purposes of excluding a deported alien from subsequent admission and making it a felony for such alien to enter or attempt to enter the United States. Act of March 4, 1929, §1 (a), 45 Stat. 1551, 8 U. S. C. (1940 ed.) § 180 (a). It has been carried forward in the current provisions and made applicable to the Immigration and Nationality Act generally. § 101 (g), 66 Stat. 173, 8 U. S. C. § 1101 (g).

Any possible doubt of the import of this provision is removed by H. R. Rep. No. 2418, 70th Cong., 2d Sess., 6, which explained the provision as follows:

"Owing to the inadequacy of the appropriations now made for enforcement of deportation provisions under existing law, the Department of Labor has, in many cases, after a warrant of deportation has been issued, refrained from executing the warrant and deporting the alien, at the expense of the appropriation, to the country to which he might be deported, upon the condition that the alien voluntarily, at his own expense, leave the United States. Some doubt exists whether an alien so departing has been 'deported.' Subsection (b) of section 3 of the bill [the provision quoted above] therefore removes any possible doubt on this question by providing that in such cases the alien shall be considered to have been deported in pursuance of law."

The petitioner's departure was thus properly treated as a deportation by the Immigration and Naturalization Service, officials of which marked the warrant for deportation as "executed" and prepared papers, including a "Description of Person Deported," recording his deportation and the manner in which it was accomplished. The latter document also noted that the petitioner had a Yugoslavian passport.[5]

---

[5] There is no foundation for the suggestion that in 1942 there was a special kind of departure called "reshipment" which did not have the effect of executing the outstanding deportation order. The petitioner's "reshipment" was nothing more or less than his signing on board ship and departing on it. The notation "Reshipped" on the deportation warrant was scrawled in pencil on the back of the warrant. It was made by an unidentified person for an unknown purpose, and appears underneath the endorsement of the warrant's execution by the Immigration Inspector. (More relevant in this

The petitioner challenges none of the above. He pitches his argument on the statutory definition of "residence" as "the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent." Immigration and Nationality Act, § 101 (a)(33), 66 Stat. 170, 8 U. S. C. § 1101 (a)(33). The petitioner argues that the statute makes "residence" a question of observable fact, and that, on this basis, his residence throughout the 1942 voyage must be taken as having remained in the United States. He points to various circumstances surrounding his departure which, he argues, establish that his "residence," as defined above, was not interrupted in 1942, although he was physically absent from the United States for the period of the voyage.

The facts on which the petitioner relies are of two kinds. He points first to such typical indicia of residence as the maintenance of a bank account in this country and continued membership in a domestic union. More weight, however, is placed on the inclusion in the warrant for the

---

connection is the fact that the name of the ship on which the petitioner departed and the date of his departure appear in the blank for the "steamer and date *on which deported*"—italics added—on the official "Description of Person Deported.")

The petitioner had recently been through a deportation hearing. Just one month before his departure he had been ordered deported. In those circumstances, it can scarcely be maintained that he did not understand his departure to be pursuant to the warrant for his deportation. (Any doubts on this score must assuredly have been cleared up by his detention on board ship on his return.)

Indeed, discussion of the manner of the petitioner's departure seems beside the point in view of his concession that his departure executed the warrant for his deportation. (If by his departure he managed to execute the warrant for his deportation but nevertheless remain undeported, he was able to *improve* his status by leaving the country. The suggestion is untenable.)

petitioner's deportation in 1942 of a "Ninth Proviso clause," which provided:

> "If the alien returns to the United States from time to time and upon inspection is found to be a bona fide seaman and entitled to shore leave, except for prior deportation, admission under the 9th Proviso of Section 3 of the Act of February 5, 1917, in reference to this ground of inadmissibility is hereby authorized for such time as the alien may be admitted as a seaman."

This clause, included in the warrant pursuant to statutory authority,[6] relieved the petitioner of the combined effect of provisions making arrest and deportation a basis for exclusion [7] and depriving an alien seaman subject to exclusion of landing privileges.[8] The petitioner suggests that due to wartime conditions deportation to Yugoslavia was impossible in 1942 and that the order of deportation was therefore in reality but a formality or fiction, everyone involved understanding, as the "Ninth Proviso

---

[6] ". . . [T]he Commissioner General of Immigration with the approval of the Secretary of Labor shall issue rules and prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of otherwise inadmissible aliens applying for temporary admission." Act of February 5, 1917, § 3, 39 Stat. 875, 878, 8 U. S. C. (1940 ed.) § 136 (q). Similar provisions are included in the current statute. Immigration and Nationality Act, § 212 (d)(3), 66 Stat. 187, 8 U. S. C. § 1182 (d)(3).

[7] Act of March 4, 1929, § 1 (a), 45 Stat. 1551, 8 U. S. C. (1940 ed.) § 180 (a), carried forward in the Immigration and Nationality Act, §§ 212 (a)(17), 276, 66 Stat. 183, 229, 8 U. S. C. §§ 1182 (a)(17), 1326.

[8] Act of March 4, 1929, § 1 (c), 45 Stat. 1551, 8 U. S. C. (1940 ed.) § 180 (c). Compare the related provisions of the Immigration and Nationality Act, § 252 (a), 66 Stat. 220, 8 U. S. C. § 1282 (a).

clause" is said to attest, that he would be readmitted when his ship returned.

This argument contradicts what is plainly shown by the record. There is nothing in the order of deportation, in the endorsement of its "execution," or in any of the subsequent proceedings to indicate that the deportation order was not what it purported to be. No reason is suggested why the immigration authorities should have gone through a meaningless ritual of deportation for the purpose of *not* deporting the petitioner. The ameliorative clause on which the petitioner relies indicates, if anything, that the petitioner was not intended to be readmitted as a resident; his admission was conditioned on a finding that he was "a bona fide seaman and entitled to shore leave" and was authorized only "for such time as the alien may be admitted as a seaman."

Once these arguments are laid to rest, the proper disposition of this case is clear and unavoidable. By express legislative directive, the petitioner's departure in 1942 is for present purposes to be regarded as a deportation. We think it beyond dispute that one who has been deported does not continue to have his residence here, whatever may be the significance of other factors in the absence of a valid deportation. In an early case, this Court stated:

"The order of deportation . . . is but a method of enforcing the return to his own country of an alien who has not complied with the conditions upon the performance of which the government of the nation, acting within its constitutional authority and through the proper departments, has determined that his continuing to reside here shall depend." *Fong Yue Ting* v. *United States,* 149 U. S. 698, 730.

It would be quite impossible to consider that a deported alien, whose re-entry into this country within a year of deportation would be a felony,[9] nevertheless continues to reside in this country.

The obvious purpose of deportation is to terminate residence. It would defy common understanding and disregard clear legislative intent were we to hold that that purpose had not been achieved in this instance.

The judgment is

*Affirmed.*

MR. JUSTICE GOLDBERG, with whom MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS join, dissenting.

Congress humanely designed § 249 of the Immigration and Nationality Act of 1952, as amended by the Act of August 8, 1958, 72 Stat. 546, 8 U. S. C. § 1259, to permit the Attorney General, if specified conditions are satisfied, to regularize the status of certain categories of aliens illegally in the country. Among the prerequisites for obtaining permanent resident status—"registry" as it is commonly termed—are (1) entry prior to June 28, 1940, (2) continuous residence in the United States thereafter, and (3) good moral character.

The Court acknowledges that petitioner has satisfied the entry and character conditions of the statute. It holds, however, that the continuous residence requirement has not been satisfied because petitioner must be considered, as a matter of law, to have been deported in October 1942 when he sailed as a crewman aboard the Yugoslavian vessel S. S. *Dubravka* on a round trip voyage of two and a half months' duration between California and Chile.

---

[9] Immigration and Nationality Act, § 276, 66 Stat. 229, 8 U. S. C. § 1326.

The difficulty with the Court's conclusion is that it rests, as I shall show, entirely on a legal fiction. I am unwilling to attribute to Congress, in enacting this remedial provision designed to regularize the status of long-resident aliens illegally in the country, an intent to deport them on the basis of legal fictions refuted by facts.

The warrant of September 4, 1942, on which the Court relies, directed petitioner's deportation to Yugoslavia. The Government concedes, as indeed it must, the "practical impossibility" of deporting petitioner to Yugoslavia in 1942 in the midst of the war. Yugoslavia was then overrun and occupied by enemy forces. Petitioner could not have been, and was not in fact, deported to Yugoslavia. The Government suggests that it could have deported petitioner to Great Britain which was then the seat of the Yugoslav Government in exile. In fact, however, while other Yugoslav seamen stranded in the United States were deported to Great Britain during the war, petitioner was not. The Government does not claim that it actually executed the warrant in this way. The warrant itself shows that petitioner was not deported to Yugoslavia, Great Britain or any other foreign country. In returning the warrant as "executed," an immigration official scribbled on its face "Reshipped." [1] He also caused to be typed after the printed word "Executed" on the warrant, "October 6th, 1942 Jogo Slav MS Dubravka." The record also contains the following telegram from

---

[1] The Court's statement that the notation "Reshipped" was "made by an unidentified person for an unknown purpose . . . ," is difficult to understand. *Ante,* at 564, n. 5. The notation appears on the warrant which has continuously been in the exclusive possession of the Government. That this notation could have been and was made only by an immigration official is confirmed by the telegram of October 21, 1942.

agents of the Service to the Commissioner of Immigration and Naturalization:

"Ellis Island, N. Y. H., October 21, 1942—99563/665.

"Immigration & Naturalization Service,
"Philadelphia, Pa.

"ATWAR Ivan Mrvica . . . RESHIPPED.

.          .          .

"W. J. Zucker,
"Acting District Director
"New York District
"By
"J. A. CHRISTOPHERSON
"Inspector in Charge
"Law Division"

This telegram was confirmed as follows:

"The alien reshipped foreign October 6, 1942, ex MS Dubravka, from San Pedro, California. Original warrant of deportation, appropriately executed, is attached."

In light of this record of what actually occurred, there is no support for the Court's conclusion that: "There is nothing in the order of deportation, in the endorsement of its 'execution,' or in any of the subsequent proceedings to indicate that the deportation order was not what it purported to be." *Ante,* at 567. On the contrary, the record clearly shows that petitioner was not actually deported to Yugoslavia in accordance with the terms of the warrant. Equally untenable is the Government's argument that by taking the single brief round-trip voyage to South America petitioner terminated his continuous residence in the United States: "because the vessel he boarded flew the Yugoslav flag . . . it may be said that petitioner at once resumed his former Yugoslav resi-

dence. . . . His actual dwelling place in fact was his ship."

The definition of residence in the Immigration and Nationality Act refutes the view that by his "physical presence" on the ship petitioner abandoned his American residence.[2]   The statute, § 101 (a)(33) of the Immigration and Nationality Act of 1952, states that the "term 'residence' means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact . . . ."  There can be no doubt that in fact petitioner's dwelling place was not the ship; his "place of general abode" was on shore in the United States where it has been continuously since January 1940.  Ever since he entered and overstayed his leave in January 1940, petitioner has sought by all available means to remain in the United States.  His single aim from which he has never deviated has been to regularize his status in the country.[3]   The Court's view that petitioner by shipping to South America departed the United States is a legal conclusion—under the circum-

_____

[2] Section 101 (a)(33) provides that:

"The term 'residence' means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent.  Residence shall be considered continuous for the purposes of sections 1482 and 1484 of this title where there is a continuity of stay but not necessarily an uninterrupted physical presence in a foreign state or states or outside the United States."   66 Stat. 170, 8 U. S. C. § 1101 (a)(33).

[3] Petitioner never concealed himself from the authorities, either before or after his voyage in 1942.  On the contrary, he registered both as an alien and for selective service and was at all times willing, as he testified under oath at the immigration hearing, to "fight for the United States Government."  He has a brother and other relatives in the United States; and his wife and children, to whom he regularly sends $200 a month in Yugoslavia, have an application pending for a visa to the United States and are awaiting regularization of his status to join him here.

stances here, a mere legal fiction. It must be remembered that the voyage which is said to have terminated petitioner's residence was a wartime voyage on a privately owned ship which, although flying a Yugoslav flag, was then part of the allied merchant marine under the effective control of the United States.

Of course where an alien is subject to a warrant of deportation and with the permission of the Government knowingly and voluntarily leaves the country in order to avoid the consequences of enforced deportation, he will be deemed to have "left the United States," within the meaning of the statute applicable at the time of petitioner's voyage. 8 U. S. C. (1940 ed.) § 180 (b). This statute, however, like all the provisions of the Immigration Law, "cannot be 'mechanically applied,' " *Costello* v. *Immigration and Naturalization Service,* 376 U. S. 120, 130, to a situation where, as here, the facts negate voluntary departure.

There is nothing in the record of this case to show that petitioner was advised or notified that he was being deported when he shipped on the Yugoslav vessel. To the contrary the record shows, in the language of an immigration officer, that petitioner "reshipped." Nor can it be said that he did so "voluntarily." The Government frankly states, what is commonly known, that there was a shortage of merchant seamen during the war, and that all available means were used to insure that foreign seamen stranded in this country would "ship foreign," *i. e.,* on allied merchant ships. I imply no criticism of the Government's efforts to man needed ships under the exigencies of war. I do maintain, however, that the circumstances negate the claim that petitioner "voluntarily" departed or left the United States when he "reshipped."

The petitioner and the Government both knew when he sailed, moreover, that because of the prevailing war-

time conditions and the limited itinerary of the voyage, he would shortly return and would be readmitted to the United States. Indeed in the warrant itself, petitioner was given express permission, notwithstanding the alleged deportation, to receive shore leave on returning.[4] Under these circumstances, it is my view that petitioner in fact never gave up his residence in the United States.[5] Since he never abandoned his residence in fact, he cannot, under the express terms of § 101, be deemed to have given it up "as a matter of law." For under this section residence is one's "actual dwelling place in fact" to be determined not by petitioner's physical presence on a ship for a short voyage nor by the Government's "intent" to terminate his residence here—an intent "executed" merely by marking a warrant calling for petitioner's deportation to Yugoslavia "reshipped SS Dubravka."[6] Since petitioner, in my view, remained a resident of the United States under § 101 notwithstanding his brief voyage, it follows that he has met the continuous residence requirement of § 249 and is entitled to registry.

---

[4] The Government correctly argues that such permission did not constitute "an invitation" to return. This fact does, however, confirm what is clear from the surrounding circumstances, that the Government was fully aware that he would be returning to the United States.

[5] While on the ship, petitioner maintained all his ties in the United States, including his bank account and his union membership.

[6] In support of its contention that "a seaman can have his residence aboard a ship," the Government cites a number of statutes, such as the Act of May 9, 1918, 40 Stat. 542, giving residence credit to a seaman who serves for "three years on board of merchant or fishing vessels of the United States . . . ." No one questions the power of Congress to grant such credit. The Government points to no statutes or cases, however, which indicate that a single limited round trip voyage by a seaman converts the ship into "his principal, actual dwelling place in fact."

In *Costello* v. *Immigration and Naturalization Service,* 376 U. S., at 130, decided less than two months ago, this Court said that "in the absence of specific legislative history to the contrary, we are unwilling to attribute to Congress a purpose to extend this fiction [the relation-back concept] to the deportation provisions . . . ." We should similarly be unwilling to attribute to Congress a purpose to deport an alien of good moral character who has been a long-time resident of this country and who is otherwise eligible for the relief afforded by § 249 of the Act, by the fiction that he deported himself by shipping, with Government encouragement, as a seaman on a two-and-a-half-month round-trip voyage to South America during the war. In *Rosenberg* v. *Fleuti,* 374 U. S. 449, we refused to construe "entry" so mechanically as to impute to Congress the intent "to exclude aliens long resident in this country after lawful entry who have merely stepped across an international border and returned in 'about a couple of hours.' " *Id.,* at 461. Here, too, we should refuse to define departure so mechanically as to impute to Congress the intent, contrary to the humane purpose of § 249, to permit the deportation of an alien resident in this country almost a quarter of a century.