[No. F027528. Fifth Dist. Nov. 24, 1998.]

THE PEOPLE, Plaintiff and Appellant, v.
BILLY J. HORN, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*The opinion is certified for publication with the exception of the segment of "Statement of Facts" entitled "Sentencing," and part A. of the Discussion.

**COUNSEL**

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Stan Cross and Janet E. Neeley, Deputy Attorneys General, for Plaintiff and Appellant.

James T. Wilson, under appointment by the Court of Appeal, for Defendant and Appellant.

**OPINION**

**DIBIASO, Acting P. J.—**

### STATEMENT OF THE CASE

Appellant Billy J. Horn was convicted by jury verdict of failing to register as a sex offender (Pen.[1] Code, § 290, subd. (g)(2)).[2] The jury also found true allegations that Horn had suffered two prior convictions, one for forcible rape (§ 261, subd. (a)(2)), and the other for forcible lewd and lascivious acts with a child under the age of fourteen (§ 288, subd. (b)), which qualified as serious or violent felonies within the meaning of sections 667, subdivisions (d) and (e), and 1170.12.[3]

At the sentencing hearing the trial court found the prior section 261, subdivision (a)(2), conviction to be a strike for purposes of section 667, subdivisions (d) and (e), but declined to give the same treatment to the prior section 288, subdivision (b), conviction because it had been stayed pursuant

---

[1]References to code sections are to the Penal Code unless otherwise specified.

[2]The verdicts were returned at the second trial on the charge. Horn's first trial was declared a mistrial when the jury was unable to reach a verdict.

[3]Horn's prior convictions were the subject of an unpublished opinion by this court in *People* v. *Horn,* F013197, filed January 8, 1991.

to section 654 by the court which had sentenced Horn for the priors. The trial court then imposed the midterm of two years in state prison for the section 290 offense, which was doubled to four years pursuant to section 667, subdivision (e)(1).

Both Horn and the People have appealed.[4]

STATEMENT OF FACTS

*Trial Evidence*

On November 19, 1989, Horn was convicted of forcible rape, in violation of section 261, subdivision (a)(2), and also convicted of lewd and lascivious acts with a child under the age of 14 years by means of force, in violation of section 288, subdivision (b). He was sentenced to the midterm of six years for the section 261 conviction, but the term imposed for the section 288 conviction was stayed pursuant to section 654. Horn was also ordered to register as a sex offender under section 290. Horn was eventually released on parole from state prison after having served the sentence imposed for the section 261 offense.

After he was paroled, Horn registered as a sex offender with the Hanford Police Department on September 1, 1992, giving as his address 112 West Second Street, Hanford. The registration officer testified he told Horn to reregister within 10 days of any "change of address." The back of the receipt Horn received when he registered also stated that he was required to reregister within 10 days of changing his residence.

In January 1993, Horn's parole officer reviewed with him the sex offender registration obligations imposed by section 290. The parole officer reminded Horn that he had to reregister within 10 days if he moved. Throughout his period of parole, Horn's registered address for section 290 purposes was 112 West Second Street; he never notified the police department of any other address. The parole officer testified that when he would stop to see Horn at the West Second Street address, more often than not Horn was not there. The parole officer also testified that a condition of Horn's parole was that he not have contact with, or reside with, children under the age of 18 years.

On August 30, 1995, the Hanford Police Department was dispatched to the Amberwood Apartments in connection with a 911 call from Sonja

---

[4]Horn presented a notice of appeal on January 31, 1997, to the Kings County Superior Court, which initially filed the notice of appeal and then returned it to Horn with the notation the record had been forwarded to this court on January 15, 1997. By order dated March 27, 1997, we deemed Horn's notice of appeal to have been timely filed.

Cordero. In response to the call, Officers Lester Pollard and Anthony DeWall went to apartment C at the complex. Horn answered the officers' knock on the door. He spoke to the officers and said there was no problem, then shut the door. Pollard overheard Horn tell DeWall that he was living at the apartment; DeWall noted in his report that Horn was living at the apartment.

The Amberwood Apartments were located at 11190 Oakview Drive in Hanford. Cordero lived in apartment C with her two young sons. Horn's parole officer testified it would have been a violation of parole for Horn to have contact with Cordero's children or to reside with her and her children; if he had known of the contact he would have returned Horn to custody.

Horn was discharged from parole on October 1, 1995.

On February 22, 1996, Pollard and Officer Pete Moes contacted Horn regarding an investigation they were conducting. The officers met Horn in the parking lot of the Amberwood Apartments. Moes overheard Horn tell Pollard that he lived in the apartments. Moes previously had been in charge of registering sex offenders for the police department and knew that Horn was required by section 290 to register. Moes thought Horn had registered under another address, so, when Horn stated that he lived in apartment C, Moes asked the police dispatcher to check Horn's registered address. Moes asked Horn if he knew he was supposed to register as a sex offender; Horn responded affirmatively. After receiving a report from the dispatcher, Moes told Horn that he was registered at 112 West Second Street. Horn replied that he had not lived there in awhile. Horn was then arrested. During the booking process, Horn told Pollard that his address was 11190 Oakview Drive, apartment C.

The manager of the Amberwood Apartments, Paulette Reynosa, testified that Cordero and Horn lived in apartment C, had been living there when Reynosa and her husband began managing the apartments in May 1995, and were still living there in February 1996. Reynosa stated that she frequently saw Horn at the apartment, usually in the mornings, and had observed him cooking, doing dishes, and watching Cordero's children at various times. In July 1995, Horn had asked Reynosa's husband to make a small repair at the complex, and another time had asked Reynosa to plant grass in a dirt area. Once, Reynosa conducted an inspection of apartment C when Horn was the only person present.

A rental application dated October 27, 1994, was in the file. It identified Horn, Cordero, and her two children as the tenants; both Horn and Cordero had signed it.

On November 17, 1995, Horn and Cordero filled out a change of income statement and other documents relating to their occupancy of the apartment, at Reynosa's request. Horn and Cordero also signed a lease for the apartment on that date. Horn's income affected the amount of rent being charged for the apartment; in fact, it caused an increase in the rent because it lowered the subsidy amount. Horn's name was on the lease as a cotenant who was responsible for rent.

Horn testified in his own defense. He maintained that his residence was 112 West Second Street, where his grandmother lived. He claimed his personal property was kept at the West Second Street address and that he received his mail at that address. Horn testified he helped Cordero move into the Amberwood Apartments, and occasionally stayed there with her from time to time, but considered 112 West Second Street to be his residence. He admitted signing various rental documents, but claimed he did so at Cordero's request. Horn denied ever telling any police officer that he lived at the apartment.

Cordero testified that Horn did not live with her, but occasionally stayed overnight at the apartment. She stated that Horn did not have a key to the apartment and kept no furniture and very little clothing there. Cordero testified she paid the rent and utilities and purchased the food for the apartment. She maintained that Horn lived with his grandmother and had signed the various rental documents so that he could occasionally spend the night with her.

*Sentencing**

. . . . . . . . . . . . . . . . . . . . . . . . .

## DISCUSSION

A. *The People's Appeal:**

. . . . . . . . . . . . . . . . . . . . . . . . .

B. *Horn's Appeal:*

In 1996, section 290, subdivision (a)(1), read: "Every person described in paragraph (2), for the rest of his or her life while residing in California, shall be required to register with the chief of police of the city in which he or she is domiciled, or the sheriff of the county if he or she is domiciled in an

*See footnote, *ante*, page 408.

unincorporated area, and, additionally, with the chief of police of a campus of the University of California or the California State University if he or she is domiciled upon the campus or in any of its facilities, within 14 days of coming into any city, county, or city and county in which he or she temporarily resides or is domiciled for that length of time. The person shall be required annually thereafter, within 10 days of his or her birthday, to update his or her registration with the entities described in this paragraph, including, verifying his or her address on a form as may be required by the Department of Justice."

At the time Horn was arrested and convicted, section 290, subdivision (f), provided: "If any person who is required to register pursuant to this section changes his or her residence address, the person shall inform, in writing within 10 days, the law enforcement agency or agencies with whom he or she last registered of the new address. The law enforcement agency or agencies shall, within three days after receipt of this information, forward it to the Department of Justice. The Department of Justice shall forward appropriate registration data to the law enforcement agency or agencies having local jurisdiction of the new place of residence." (Stats. 1995, ch. 85, § 1 and ch. 840, § 2.)[6]

There are no CALJIC form jury instructions for the crime of failing to register under section 290; the trial court was therefore required to craft an appropriate charge. It did so, giving both the prosecutor and defense counsel an opportunity to comment or object.[7] The defense objected to the portions of the trial court's instructions which addressed the meaning of the word "residence" in section 290. These instructions read, in part, as follows:

"As used in this instruction the term residence means a temporary or permanent dwelling place, which one keeps and to which one intends to return, as opposed to a place where one rests or shelters during a trip or a transient visit.

"Depending upon the circumstances, one may have a single place of residence or more than one place of residence."

"One who has one place of residence and then adds a second place of residence has changed his residence within the meaning of this law and has

---

[6]This subdivision was later amended to reduce the applicable time period from 10 days to 5 working days. (Current § 290, subd. (f).)

[7]Both Horn and the People refer in their briefs at times to the transcript of the September 13, 1996, discussion among the court and counsel regarding jury instructions. This discussion occurred, however, during Horn's first trial, which resulted in a mistrial. Horn's second trial commenced in October 1996.

a duty to report this change resulting in an additional residence even though he may also maintain a residence at the old place."

This instruction was read to the jury, and written copies were later provided to the jury after the court received a note from the jurors asking for a definition of "residence."

 Horn now contends the instruction "imposed an obligation on him [to report a second place of residence if he had more than one place of residence] beyond the plain language of section 290" because the statute did not require registration of a " 'second place of residence.' " Alternatively, he argues the statute is ambiguous and therefore that the rule of lenity requires that a narrow definition be given to the word "residence," such as that set forth in Government Code section 244.[8]

We disagree. Based upon the intent and language of the statute, we hold that the instruction correctly stated that a defendant is required to register an additional place of residence if he has one.

In *People* v. *McCleod* (1997) 55 Cal.App.4th 1205 [64 Cal.Rptr.2d 545], the defendant argued the trial court had misinstructed the jury on the elements of section 290 because the court failed to provide the jury with a definition of "residence." (55 Cal.App.4th at p. 1216.)[9] The jury had requested such a definition, but before one was prepared the jurors returned a verdict of guilty. On appeal, the defendant claimed it was error for the trial court to allow the jury to continue to deliberate pending receipt of the requested information. (*Id.* at pp. 1214-1215.) The appellate court decided there was no error, on the rationale that the term residence as used in section 290, subdivision (f), is "so easily understood by a person of common

---

[8]Government Code section 244 defines "residence" for purposes of the provisions of the Government Code which deal with the political rights of the people of this state. It provides:

"In determining the place of residence the following rules shall be observed:

"(a) It is the place where one remains when not called elsewhere for labor or other special or temporary purpose, and to which he or she returns in seasons of repose.

"(b) There can only be one residence.

"(c) A residence cannot be lost until another is gained.

"(d) The residence of the parent with whom an unmarried minor child maintains his or her place of abode is the residence of such unmarried minor child.

"(e) The residence of an unmarried minor who has a parent living cannot be changed by his or her own act.

"(f) The residence can be changed only by the union of act and intent.

"(g) A married person shall have the right to retain his or her legal residence in the State of California notwithstanding the legal residence or domicile of his or her spouse."

[9]Interestingly, in *McCleod* the defendant took the position a person could have more than one residence within the meaning of the statute. The court in *People* v. *Velasco** (Cal.App.), agreed with this construction of section 290.

---

*Reporter's Note: Opinion (B113974) deleted upon direction of Supreme Court by order dated December 16, 1998.

intelligence . . . that further definition is not required." (55 Cal.App.4th at pp. 1218-1219.)

On the way to this conclusion the *McCleod* court explored the concept of "residence" in some detail. ■ Quoting *Whittell* v. *Franchise Tax Board* (1964) 231 Cal.App.2d 278, 284 [41 Cal.Rptr. 673], the court contrasted "domicile" with "residence" and explained that: " ' "[D]omicile" properly denotes the one location with which for legal purposes a person is considered to have the most settled and permanent connection, the place where he intends to remain and to which, whenever he is absent, he has the intention of returning but which the law may also assign to him constructively. Residence, on the other hand, denotes any factual place of abode of some permanency, that is, more than a mere temporary sojourn. [citation]. While a person can have in law only one domicile [citation], he may have several "residences" for different purposes . . . .' " (*People* v. *McCleod, supra,* 55 Cal.App.4th at p. 1217.)

Summarizing the results of its survey of the law, the court said: "Because residence is not truly a synonym for domicile and its meaning in a particular statute is often subject to differing interpretations [citation], it is now well established that ' "residence" is a term of varying import and its statutory meaning depends upon the context and purpose of the statute in which it is used. [Citation.]" ' (*People* v. *McCleod, supra,* 55 Cal.App.4th at p. 1217.)

This recapitulation of the state of the law by the *McCleod* court is supported by numerous other cases which define the word residence in various contexts. In all of these opinions, the underlying theme is that the meaning of the word is governed by the purpose and intent of the statute in which it appears or in the context of the circumstances in issue. (See, e.g., *Utley* v. *Allstate Ins. Co.* (1993) 19 Cal.App.4th 815, 820 [24 Cal.Rptr.2d 1] [resident for purposes of an exclusion in an insurance policy]; *In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 155 [18 Cal.Rptr.2d 743] [residency for purposes of marital dissolution]; *People* v. *Thomas* (1986) 41 Cal.3d 837, 842 [226 Cal.Rptr. 107, 718 P.2d 94] [residence within the meaning of section 1192.7]; *National Movement for Student Vote* v. *Regents of University of California* (1975) 50 Cal.App.3d 131, 141 [123 Cal.Rptr. 141] [construction of residence as used in Elections Code former section 204.5]; *In re Morelli* (1970) 11 Cal.App.3d 819, 830-831 [91 Cal.Rptr. 72] [residency for purposes of subpoena powers]; *Hardware Mutual Casualty Co.* v. *Home Indemnity Co.* (1966) 241 Cal.App.2d 303, 311 [50 Cal.Rptr. 508] [resident of a household]; *People* v. *Kemp* (1957) 150 Cal.App.2d 654, 661 [310 P.2d 680] [residence in the context of Vehicle Code former section 90]; *Smith* v. *Smith* (1955) 45 Cal.2d 235, 239 [288 P.2d 497] ["a person may have . . .

more than one physical residence separate from his domicile and at the same time"]; *Savorgnan* v. *United States* (1950) 338 U.S. 491, 504 [70 S.Ct. 292, 299, 94 L.Ed. 287, 15 A.L.R.2d 538] [8 United States Code section 17 (1934 ed.) residency abroad establishes expatriation]; *Mrvica* v. *Esperdy* (1964) 376 U.S. 560, 565 [84 S.Ct. 833, 837, 11 L.Ed.2d 911] [8 United States Code section 1101 definition of residence]; *Pure Oil Co.* v. *Suarez* (1966) 384 U.S. 202, 203, 206 [86 S.Ct. 1394, 1395, 1396, 16 L.Ed.2d 474] [28 United States Code sections 1391, 1400]; *Dunn* v. *Blumstein* (1972) 405 U.S. 330, 354 [92 S.Ct. 995, 1009, 31 L.Ed.2d 274] [state residency requirement for voting]; *Martinez* v. *Bynum* (1983) 461 U.S. 321, 330 [103 S.Ct. 1838, 1843, 75 L.Ed.2d 879] [residency requirement for school attendance]; *Abbott Laboratories* v. *Gardner* (1967) 387 U.S. 136 [87 S.Ct. 1507, 18 L.Ed.2d 681] [28 United States Code section 1391 corporate residence].)[10] *McCleod* was followed in *People* v. *Velasco, supra.*\*

■ The purpose and intent underlying section 290 validate the instructions given by the trial court. Sex offenders have been identified by the Legislature as posing a continuing threat to society. (*Wright* v. *Superior Court* (1997) 15 Cal.4th 521, 527 [63 Cal.Rptr.2d 322, 936 P.2d 101].) Section 290 is therefore aimed at controlling crime and preventing recidivism in sex offenders. (15 Cal.4th at p. 527) " 'The purpose of section 290 is to assure that persons convicted of the crimes enumerated therein shall be readily available for police surveillance at all times because the Legislature deemed them likely to commit similar offenses in the future.' " (*Ibid.*, citing *Barrows* v. *Municipal Court* (1970) 1 Cal.3d 821, 827 [83 Cal.Rptr. 819, 464 P.2d 483].)

This objective would be defeated entirely were an offender allowed to remain at one or more undisclosed locations on a regular basis, even if the locations were not the offender's exclusive abode. (*Wright* v. *Superior Court, supra,* 15 Cal.4th at p. 527; *People* v. *McCleod, supra,* 55 Cal.App.4th at p. 1218; *People* v. *Velasco, supra.*\*) "[S]ex offenders often have a transitory lifestyle or deliberately attempt to keep their movements secret." (*Wright, supra,* at p. 529.) An offender would hardly be subject to "surveillance at all times" if he or she were not required to register addresses at which the offender spent more than a brief, passing amount of time. (*People* v. *Velasco, supra.*\*)

Our construction of the statute does not impose an obligation on Horn which is "beyond [its] plain language" any more than the California Supreme Court's holding that the statute was a continuous offense imposed such an unstated obligation. (*Wright* v. *Superior Court, supra,* 15 Cal.4th at

---

[10]A number of these cases were referred to by the trial court during a discussion on jury instructions in the first, mistried trial.

\*See Reporter's Note, *supra*, at page 415.

pp. 526-527.) Although the word residence is in the singular throughout the statute, nothing in the language of section 290 compels a conclusion that an offender can have only one residence at a time. (See former § 290, subd. (a)(1); *Wright* at pp. 526-527; *People* v. *Velasco, supra.**) Moreover, by referring to a "temporary residence," the Legislature acknowledged the fact that an offender could have more than one residence; the existence of a "temporary" residence presupposes the contemporaneous existence of a "permanent" one.

This case provides a graphic example of how the statute could be easily evaded if we were to adopt the restricted meaning of residence put forth by Horn. An offender could satisfy the statute but violate other conditions of parole and avoid discovery by simply maintaining some indicia of residence at the registered location and declaring it to be such, while at the same time "living" for all intents and purposes for an extended duration at a different address entirely unknown to the authorities. We thus agree with the court in *McCleod* that a fair reading of the statute "contemplates notification by the offender when he is in a place where he is living or temporarily staying" for more than the limited time period specified in the statute. (*People* v. *McCleod, supra,* 55 Cal.App.4th at p. 1219.) This broad construction of the word "residence" in section 290, which necessarily means that an offender may have more than one residence for purposes of the registration requirement, gives effect to the purpose for which the statute was enacted. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 826 [4 Cal.Rptr.2d 615, 823 P.2d 1216]; *People* v. *Broussard* (1993) 5 Cal.4th 1067, 1071 [22 Cal.Rptr.2d 278, 856 P.2d 1134].)

Nothing in Horn's brief persuades us that the trial court's instructions were inconsistent with section 290. To read into the statute the provisions of Government Code section 244 that there "can only be one residence" and that a "residence cannot be lost until another is gained," would render subdivision (a)(1) of section 290 nonsensical, subvert completely the purpose of the statute, and make surplusage of the words "temporarily resides" contained in it. "It is a settled axiom of statutory construction that significance should be attributed to every word and phrase of a statute, and a construction making some words surplusage should be avoided." (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1010 [239 Cal.Rptr. 656, 741 P.2d 154].)

Moreover, to equate residence and domicile for purposes of section 290 would be inconsistent with both the law and the language of the statute. First, as the court in McCleod pointed out, domicile and residence are not synonyms. (*People* v. *McCleod, supra,* 55 Cal.App.4th at p. 1217; see also *People* v. *Velasco, supra.**) Second, subdivision (f) does not refer to

---

*See Reporter's Note, *supra*, at page 415.

"domicile, but subdivision (a) of section 290 refers to both "residence" and "domicile." The Legislature would not have used the word residence in subdivision (f) if it intended it to have the identical meaning as the word domicile. (See *People* v. *Broussard, supra,* 5 Cal.4th at p. 1071.)[11]

Horn cites *People* v. *Ramirez* (1967) 253 Cal.App.2d 910 [61 Cal.Rptr. 309], a case which addressed a similar registration requirement found in the Health and Safety Code. (*Id.* at p. 911.) In *Ramirez,* the arresting officer testified he took the defendant into custody because he believed the defendant " 'had two residences and that he was telling the Police Department about one of them.' " (*Id.* at p. 912.) The evidence established that the defendant had registered as an offender and stated that he maintained a residence at the El Ray Hotel. For a period of about three weeks, however, the defendant had shown up at the Barclay Hotel with a woman and registered there on a daily basis. (*Ibid.*) The appellate court concluded that this evidence reflected a "brief sojourn" and a "transitory" relationship with the woman, which did not suffice to constitute a change of residence. (*Ibid.*)

*Ramirez* is not authority for the interpretation Horn wants us to put on section 290. The court in *Ramirez* did not address the question we face here, and was only concerned with the sufficiency of the evidence to establish the change of residence alleged by the prosecution. We do not find anything in *Ramirez* which undermines our holding that an offender subject to section 290 may have more than one registrable residence at a time, and, if the opinion was inconsistent with our conclusion, we would decline to follow it.

■ With respect to Horn's claim that the statute, if ambiguous, must be interpreted under the rule of lenity, we agree. This principle, however, does not require that the statute be given its narrowest meaning, nor does it require that the statute be strained and distorted in order to exclude conduct clearly within its scope. (*People* v. *Forbes* (1996) 42 Cal.App.4th 599, 603-604 [49 Cal.Rptr.2d 836].) It merely means that the statute will be construed as favorably to the defendant as its language and intent will reasonably permit. (*People* v. *McCleod, supra,* 55 Cal.App.4th at p. 1216.) ■ We are satisfied that our interpretation of the word residence in section 290 meets these guidelines.

Having concluded that the jury instructions were not erroneous, we need not address Horn's argument that he was prejudiced. We do note in passing, however, that the record evidence, set forth more fully in the Statement of Facts *ante*, is more than sufficient to justify the jury's verdict. Horn had

---

[11]We note that in 1997 the Legislature removed the word domicile from subdivision (a)(1). (Stats. 1997, ch. 821, § 3.5.)

signed a rental application with Cordero in October 1995; they both signed a lease for the apartment in November 1995; his income was used as a basis for calculating the rent; and he was regularly at the apartment with Cordero and her two children from at least May 1995 to the time of his arrest in February 1996. These contacts support a finding by the trier of fact that Horn's connection to the apartment was outside the realm of a brief sojourn or transitory relationship of less than the 14 days then set forth in section 290, subdivision (a). It was undisputed that Horn did not register the 11190 Oakview Drive address with the appropriate authorities.

## DISPOSITION

The judgment of conviction is affirmed. The judgment of sentence is vacated and the matter is remanded for resentencing.

Buckley, J., and Wiseman, J., concurred.